UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

ARLENE MCGUIRE,

    Plaintiff,                      CIVIL ACTION NO. 16-cv-13113

    v.                              DISTRICT JUDGE PAUL D. BORMAN

MCCORMICK, et al.,            MAGISTRATE JUDGE MONA K. MAJZOUB

    Defendants.
_____/

### REPORT AND RECOMMENDATION

Plaintiff Arlene McGuire commenced this *pro se* action on August 29, 2016, against Defendants Joseph McCormick, Director of the Advanced Metering Infrastructure ("AMI") program of the Detroit Edison Company ("DTE"); Robert Sitkauskus, an employee of DTE also involved in the AMI program; Valerie Brader, Executive Director of the Michigan Agency for Energy; unknown John Doe employees of DTE; and two Congressmen from the Michigan House of Representatives: Aric Nesbitt, Representative of the 66th District, and Frank Liberati, Representative of the 13th District. (Docket no. 1.) She alleges a number of violations of federal law relating to DTE's AMI program, including violations of the federal Energy Policy Act of 2005, 16 U.S.C. § 2621(d)(14)(A) & (C); the federal wiretapping act, 18 U.S.C § 2510; and the Fourth, Fifth, Ninth, and Tenth Amendments to the United States Constitution. (Docket no. 1 at 45–55.) She also asserts a number of violations of state law including, "burdening utility easement," "diminution of property value," "invasion of privacy," "conversion," "personal injury," "gross negligence" specifically directed at Defendant Representatives Nesbitt and Liberati, and several forms of trespassing. (*Id.* at 59–62.) Before the Court are Defendant

Brader's Motion to Dismiss, or in the Alternative, for a More Definite Statement (docket no. 11), Defendants McCormick & Sitkauskus's Motion to Dismiss (docket no. 13), and Defendants Liberati & Nesbitt's Motion to Dismiss (docket no. 17). Plaintiff filed responses to each of the motions (docket nos. 35, 34, 36), and Defendants filed replies (docket nos. 38, 39, 37). This matter has been referred to the undersigned for all pretrial purposes. (Docket no. 3.) The undersigned has reviewed the pleadings, dispenses with a hearing pursuant to Eastern District of Michigan Local Rule 7.1(f), and issues this Report and Recommendation pursuant to 28 U.S.C. § 636(b)(1)(B).

## I.  RECOMMENDATION

For the reasons that follow, it is recommended that each of the Defendants' motions to dismiss (docket nos. 11, 13, 17) be **GRANTED**. Moreover, all claims against the John Doe defendants should be dismissed for the same reasons the claims against Defendants McCormick and Sitkauskus should be dismissed, as set forth herein. This matter should therefore be dismissed in its entirety.

## II.  REPORT

### A.  Background

This matter arises from DTE's decision to begin implementing a "smart grid," system, in part using funds from the United States Department of Energy. *In re Application of DTE to Implement Opt Out Program*, Nos. 316728, 316781, 2015 WL 728383, at *1 (Mich. Ct. App. Feb. 19, 2015),[1] *cert. denied*, 874 N.W.2d 698 (Mich. 2016). The smart grid system is intended to "increase the reliability of the electric grid, reduce outage time, and otherwise improve

---

[1] In this decision, the Michigan Court of Appeals specifically upheld the decision of the Michigan Public Service Commission approving DTE's proposed "opt-out" program from the AMI/smart meter system, which Plaintiff complains about in this case, and which is discussed in more detail below. The undersigned relies in part on this opinion in explaining the background and history of the smart meter program, and for other relevant facts not set forth in Plaintiff's Complaint.

service." *Id.* It requires the use of an Advanced Metering Infrastructure ("AMI"), or "smart meters," which, in turn, can "record near-real-time power consumption data and report that usage to the utility at frequent intervals." *Id.* This is possible because the smart meters have built-in radio transmitters which transmit customers' usage data to DTE via radio frequency signals. DTE has stated that there are a number of benefits to the use of smart meters, including $65 million in annual savings, "a greater ability to identify problems, expedited emergency response, new rate offerings, and increased customer satisfaction." *Id.*

Some of DTE's customers, however, are not satisfied. Plaintiff believes that the smart meters pose safety and health risks. She contends that the smart meters provide "detailed information" about when she or members of her family are, or are not, at home, and furthermore that DTE has not provided adequate assurances that third parties will not be able to access the "personal information being collected and transmitted by the new smart meters." (Docket no. 1 at 18, 26.) She discusses various reports which claim that exposure to radio waves correlates with "diseases such as cancer, neurological disease, reproductive disorders, immune dysfunctions, and electromagnetic sensitivity." (Docket no. 1 at 23.) DTE does allow its customers to "opt out" and disable the radio transmission function of the smart meters, but those customers are required to pay a $67.20 "initial fee," and an additional monthly fee of $9.80. (Docket no. 1 at 74.) Michigan Public Service Commission ("MPSC") staff have reported that "[o]ffering customers an electromechanical meter as an alternative to a smart meter is not a long-term solution," because "[t]he traditional electromagnetic meter is obsolete and currently not in production." *In re Application of DTE*, 2015 WL 728383, at *2.

Plaintiff received a letter from DTE on June 16, 2014, indicating that she would soon have a smart meter installed at her home, and explaining how Plaintiff can opt out and use a non-

transmitting smart meter. She responded by writing back to DTE, "insisting [the] analog meters not be changed out," and by writing a letter expressing her concerns to Defendant Representative Nesbitt, who was Chairman of the House Energy Committee at the time. (Docket no. 1 at 11–12, 77, 79.)

On September 29, 2015, Plaintiff received a letter from Defendant McCormick, indicating that DTE representatives discovered that Plaintiff had placed a locking device on the analog meter located at her residence, and instructing Plaintiff to remove the locking device so that the new meter could be installed, or else DTE would disconnect her service. (*Id.* at 82.) The letter also instructed Plaintiff to call DTE. Plaintiff did not call DTE; rather, she prepared letters vehemently objecting to the installation of the smart meter, and sent them to Defendants Nesbitt, Liberati, McCormick, and Sitkauskus, as well as to DTE, the MPSC, and others. (*Id.* at 84–99.) The following day, on September 30, 2015, DTE disconnected Plaintiff's power. It isn't clear when Plaintiff removed the locking device from the analog meter, but she did begin contacting DTE on October 1 in an effort to have her power restored. Plaintiff claims it was not restored until October 14. (Docket no. 1 at 15.) In July 2016, Plaintiff claims her smart meter caught on fire. (*Id.* at 17.)

Acting *pro se*, Plaintiff filed suit on August 29, 2016. She asserts a number of causes of action arising under federal and state law, which the undersigned will address in greater detail below. She asks the Court to order Defendants to allow her to use an analog meter at no additional expense. (*Id.* at 64.) She seeks actual damages in the amount of $4,612, which she allegedly incurred during the time period her electricity was turned off. (*Id.* at 65.) She also seeks "exemplary damages" in the amount of $100 per day from each Defendant, calculated

4

from the date the smart meter was installed. (*Id.* at 64–66.) Defendants move for dismissal under Rule 12(b)(1) and (b)(6).

### B. Governing Law

A motion to dismiss under Federal Rule of Civil Procedure 12(b)(1) challenges the court's subject matter jurisdiction by attacking the claim on its face, in which case all factual allegations of the plaintiff must be considered as true, or by attacking the factual basis for jurisdiction. *DLX, Inc. v. Kentucky*, 381 F.3d 511, 516 (6th Cir. 2004). If the factual basis for jurisdiction is challenged, the court must weigh the evidence, and the plaintiff bears the burden of proving jurisdiction. *Id.* Through its Motion, Defendant challenges the factual basis for jurisdiction over Plaintiff's claim; therefore, the court is not bound to accept all factual allegations in the Complaint.

When deciding a motion under Rule 12(b)(6), the court must "construe the complaint in the light most favorable to the plaintiff, accept its allegations as true, and draw all reasonable inferences in favor of the plaintiff." *Directv, Inc. v. Treesh*, 487 F.3d 471, 476 (6th Cir. 2007); *Inge v. Rock Fin. Corp.*, 281 F.3d 613, 619 (6th Cir. 2002). The plaintiff must provide "'a short and plain statement of the claim' that will give the defendant fair notice of what the plaintiff's claim is and the grounds upon which it rests." *Conley v. Gibson*, 355 U.S. 41, 47 (1957) (quoting Fed. R. Civ. P. 8(a)(2)). But this statement "must be enough to raise a right to relief above the speculative level." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). The plaintiff cannot rely on "legal conclusions" or "[t]hreadbare recitals of the elements of a cause of action;" instead, the plaintiff must plead "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S.

5

662, 678 (2009). This "facial plausibility" is required to "unlock the doors of discovery." *Id.* To make this determination, the *Iqbal* Court set out the following two-step analysis:

> [A] court considering a motion to dismiss can choose to begin by identifying pleadings that, because they are no more than conclusions, are not entitled to the assumption of truth. While legal conclusions can provide the framework of a complaint, they must be supported by factual allegations. When there are well-pleaded factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement to relief.

*Id.* at 679.

"When a court is presented with a Rule 12(b)(6) motion, it may consider the Complaint and any exhibits attached thereto, public records, items appearing in the record of the case and exhibits attached to defendant's motion to dismiss so long as they are referred to in the Complaint and are central to the claims contained therein." *Bassett v. Nat'l Collegiate Athletic Ass'n*, 528 F.3d 426, 430 (6th Cir. 2008) (citation omitted).

### C. Analysis

#### 1. Count I – The Energy Policy Act of 2005

In Count I, Plaintiff claims that "[b]y forcing myself and other customers of DTE to accept 'smart meters,' the Defendant(s) have not provided the freedom and choice mandated by the Energy Policy Act of 2005." (Docket no. 1 at 46.) She cites 16 U.S.C. § 2621(d)(14)(A) and (C), which provide:

> (A) Not later than 18 months after August 8, 2005, each electric utility shall offer each of its customer classes, and provide individual customers upon customer request, a time-based rate schedule under which the rate charged by the electric utility varies during different time periods and reflects the variance, if any, in the utility's costs of generating and purchasing electricity at the wholesale level. The time-based rate schedule shall enable the electric consumer to manage energy use and cost through advanced metering and communications technology.
> . . . .

6

    (C) Each electric utility subject to subparagraph (A) shall provide each customer requesting a time-based rate with a time-based meter capable of enabling the utility and customer to offer and receive such rate, respectively.

  Plaintiff's Count I should be dismissed as to all Defendants. Assuming that the statute provides for a private cause of action (which is not apparent to the undersigned and not addressed by Plaintiff), it is clear from the plain language of the statute that DTE is not prohibited from implementing its smart meter program. This statute requires covered electric utilities[2] to offer customers "a time-based rate schedule," such that the rate customers are charged for using electricity at any given time is based on the cost incurred by the utility of providing the electricity at that specific time. In order to do so, utilities must install meters that enable the utility to determine what time of day the customer is using electricity. The purposes of the statute "are to encourage (1) the conservation of energy supplied by electric utilities; (2) the optimization of the efficiency of use of facilities and resources by electric utilities; and (3) equitable rates to electric customers." 26 U.S.C. § 2611.

  The statute does not mandate any particular method for accomplishing a time-based rate schedule. DTE has elected to require all of its customers to begin using smart meters that communicate energy usage in real time to DTE via radio wave; those customers who do not want a smart meter that emits radio waves are able to "opt out" by paying a fee. The fee is based on the cost of providing electricity to customers who, because of their choice not to have a fully "smart" meter installed, are unable to participate in the time-based rate structure and still require

---

[2] The statute applies to electric utilities whose retail electricity sales exceed 500 million kilowatt-hours each year. 16 U.S.C. § 2612.

DTE employees to manually read their meters.[3]  DTE has chosen not to allow its customers to continue using fully analog meters because such meters are "obsolete and no longer in production," and because "maintaining electromechanical test facilities [and] inventory . . . could result in higher incremental costs."  *In re Application of DTE*, 2015 WL 728383, at *2.  DTE has not, however, prohibited customers from opting out of a time-based rate structure or from opting out of a radio-transmitting meter; nor is DTE failing to offer willing customers a time-based rate structure with the appropriate smart meter, as the statute mandates.  The bottom line is that Plaintiff has the choice not to use a fully smart meter and therefore not to fully participate in the time-based rate structure; she is, however, required to pay for the cost of providing her service, which DTE has determined will be higher in light of the fact that the meter will have to be manually read on location at Plaintiff's house.  Such an arrangement does not conflict with the statute.

Defendants assert other reasons for dismissal of Plaintiff's claims under the federal Energy Policy Act of 2005, including governmental immunity (docket no. 17 at 16), and Plaintiff's failure to specify which Defendants actually committed the conduct that violates the statute (docket no. 11 at 16.)  Because the undersigned has concluded the Energy Policy Act

---

[3] Quoting (in part) the Staff report from the MPSC concerning DTE's smart meter program, the Michigan Court of Appeals has stated:

> A smart meter without a communicating radio allows the utility to maintain one type of meter.  However, manual meter reading would still be required.  Customers with a non-communicating meter will not receive some benefits of AMI, and would not, for example, be able to fully participate in new rate structures.
>
> . . . .
>
> The PSC agreed with the Staff that . . . electric utilities should be required to provide an opt-out provision based on cost of service principles.

*In re Application of DTE*, Nos. 316728, 316781, 2015 WL 728383, at *2 (Mich. Ct. App. Feb. 19, 2015).

claims fail on the merits as a matter of law, these remaining arguments will not be addressed herein.

    *2.    Count II – the federal wiretapping act*

In Count II, Plaintiff claims that "[t]he Defendant(s) 'Smart Meters' are, by definition, surveillance devices which violate Federal and State wiretapping laws and go well and beyond monitoring my power usage, by record and storing [a] database of private and personal activities and behaviors of myself, without my consent or knowledge." (Docket no. 1 at 47.) She cites 18 U.S.C. § 2510, which is the definition section of the statute. Section 2511, "Interception and disclosure of wire, oral, or electronic communications prohibited," provides:

> (1) Except as otherwise specifically provided in this chapter, any person who--
>> (a) intentionally intercepts, endeavors to intercept, or procures any other person to intercept or endeavor to intercept, any wire, oral or electronic communication;
>>
>> (b) intentionally uses, endeavors to use, or procures any other person to use or endeavor to use any electronic, mechanical, or other device to intercept any oral communication when--
>>> (i) such device is affixed to, or otherwise transmits a signal through, a wire, cable, or other like connection used in wire communication; or
>>>
>>> (ii) such device transmits communications by radio, or interferes with the transmission of such communication;
>>> . . . .
>>
>> (c) intentionally discloses, or endeavors to disclose, to any other person the contents of any wire, oral, or electronic communication, knowing or having reason to know that the information was obtained through the interception of a wire, oral, or electronic communication in violation of this subsection;
>>
>> (d) intentionally uses, or endeavors to use, the contents of any wire, oral, or electronic communication, knowing or having reason to know that the information was obtained through the interception of a wire, oral, or electronic communication in violation of this subsection;
>> . . . .

9

> Shall be punished as provided in subsection (4) or shall be subject to suit as provided in subsection (5).

16 U.S.C. § 2511(1). Plaintiff's Count II should also be dismissed as to all Defendants. First, the actions Plaintiff complains of—installation and use of smart meters—were only undertaken by DTE and its employees, such that this claim does not appear to be directed at Defendants Brader, Nesbitt, or Liberati at all. As for Defendants McCormick and Sitkauskus, they correctly point out that federal law expressly approves of, and provides funds for the installation of smart meters. *See* docket no. 13 at 16; *see also* 42 U.S.C. § 17381(5) ("It is the policy of the United States . . . to achieve each of the following: . . . (5) Deployment of 'smart' technologies (real-time, automated, interactive technologies that optimize the physical operation of appliance and consumer devices) for metering, communications concerning grid operations and status, and distribution automation."); 42 U.S.C. § 17386 (federal matching fund for smart grid investment costs, including, "metering devices, sensors, control devices, and other devices integrated with and attached to an electric utility system or retail distributor or marketer or electricity that are capable of engaging in Smart Grid functions").

And, as Defendants McCormick and Sitkauskus also succinctly point out: "A smart meter does not 'intercept' a communication. . . . . Nothing is 'intercepted' because the electricity-use information goes only to the intended recipient--i.e., the utility company." (Docket no. 13 at 22.) The undersigned agrees. Plaintiff contends that cyber-attackers may attempt to hack into the "smart grid" and access information concerning when she or members of her family are home; however, nothing in the wiretapping statute would make DTE or any of the defendants liable for such a criminal act by a third party.[4]

---

[4] The undersigned notes that 18 U.S.C. § 2512(1) assigns criminal and civil liability to "any person who intentionally . . . manufactures, assembles, possesses, or sells any electronic, mechanical, or other device, knowing or having reason to know that the design of such device renders it primarily useful for the

### 3. *Counts III & IV – alleged violations of the Fourth and Fifth Amendments*

In Count III, Plaintiff alleges that "[a]s the Defendants have denied myself and DTE customers the choice to opt-out of their forced 'smart meter' installation scheme, and are being forced to provide the Defendants with additional data without my consent, this constitutes an impermissible invasion of privacy in violation of my Fourth Amendment rights guaranteed under the United States Constitution." (Docket no. 1 at 51.) In Count IV, Plaintiff alleges that Defendants all violated the Fifth Amendment to the United States Constitution because, "due to the installation of a 'smart meter' that transmits so much electromagnetic radiation (EMR), my guests will be forced to avoid certain rooms or even vacate the property altogether for their safety. This amounts to a seizing of my property by the Defendant(s)." (*Id.* at 53–54.) She also argues that Defendants violated the Fifth Amendment because she "will be forced to allow DTE to attach equipment to my residence for DTE's purposes." (*Id.* at 54.)

As in the prior counts, it is clear that Plaintiff only complains about the actions of the DTE defendants, McCormick, Sitkauskus, and several John Does. Plaintiff does not set forth any plausible theory for holding Defendants Brader, Nesbitt, and Liberati liable under the Fourth and Fifth Amendments. The Michigan Court of Appeals has expressly and emphatically held that the design and implementation of the AMI (smart meter) program was a management decision reserved to DTE, a private company. *See In re Application of DTE*, Nos. 316728, 316781; 2015 WL 728383, at *4 (Mich. Ct. App. Feb. 19, 2015) ("[T]he decision regarding what type of equipment to deploy can only be described as a management prerogative.").

The DTE Defendants cannot be held liable for any alleged violations of the Fourth and Fifth Amendments, because they are not state actors, and the Bill of Rights (of which the Fourth

---

purpose of the surreptitious interception of . . . communications . . ." However, it is beyond any serious dispute that the smart meters' primary use is to record and transmit electricity usage data to DTE.

and Fifth Amendments are a part) operates to restrain the operation of governmental power against the people, not to restrain the actions of private individuals or organizations. The United States Supreme Court has "consistently construed" the Fourth Amendment "as proscribing only governmental action." *See United States v. Jacobsen*, 466 U.S. 109, 113 (1984) (citations omitted). The Court has also explained that the "fundamental inquiry" in a Fifth Amendment case was "whether the [defendant] is a governmental actor to whom the prohibitions of the Constitution apply." *San Francisco Arts & Athletics, Inc. v. U.S. Olympic Comm.*, 483 U.S. 522, 542 (1987).

Plaintiff contends that Defendants McCormick and Sitkauskus are "quasi public functionaries," because DTE "was created by state charter, was granted a monopoly by state legislative acts," because it "must seek permission to increase rates or tariffs charged to customers," and finally because it provides "an essential 'public service.'" (Docket no. 34 at 15.) Plaintiff is incorrect. "The fact '[t]hat a private entity performs a function which serves the public does not make its acts [governmental] action.'" *San Francisco Arts & Athletics, Inc.*, 483 U.S. at 544. (quoting *Rendell-Baker v. Kohn*, 457 U.S. 830, 842 (1982)) (alterations in original). Moreover, the United States Supreme Court has found that "the supplying of utility service is not traditionally the exclusive prerogative of the State," holding that a Pennsylvania utility company's practice of terminating service for non-payment was *not state action*:

> All of petitioner's arguments taken together show no more than that Metropolitan was a heavily regulated, privately owned utility, enjoying at least a partial monopoly in the providing of electrical service within its territory, and that it elected to terminate service to petitioner in a manner which the Pennsylvania Public Utility Commission found permissible under state law. Under our decision this is not sufficient to connect the State of Pennsylvania with respondent's action so as to make the latter's conduct attributable to the State . . . .

*Jackson v. Metro. Edison Co.*, 419 U.S. 345, 358 (1974). Plaintiff's arguments here are strikingly similar to those which the Supreme Court rejected in *Jackson*, and should therefore be rejected here as well.

### 4. Count V – alleged violations of the Ninth and Tenth Amendments

In Count V, Plaintiff contends that "[t]he Defendants are in violation of the Ninth, Tenth, Fifth an Fourth Amendments to the Constitution of the United States, by depriving myself who occupies my home, the right to life, liberty and property without due process of law, and in violation of the right to equal treatment under the law . . . including those citizens who, by state law, are not mandated to accept 'smart meters.'" (Docket no. 1 at 54–55.) To the extent Plaintiff is attempting to reassert her Fourth and Fifth Amendment claims in this count, they should be dismissed for the reasons stated above.

The Ninth Amendment to the United States Constitution provides that, "[t]he enumeration in the Constitution, of certain rights, shall not be construed to deny or disparage others retained by the people." U.S. Const. amend. IX. The Sixth Circuit has held that the "Ninth Amendment confers no substantive rights in addition to those conferred by other portions of the Constitution." *Green v. Hill*, 73 F.3d 361 (table), 1995 WL 764119, at *2 (6th Cir. 1995) (affirming district court's dismissal of the plaintiff's Ninth Amendment claims) (citing *Gibson v. Matthews*, 926 F.2d 532 (6th Cir. 1991)). Plaintiff's Ninth Amendment claims should therefore be dismissed as to all Defendants.

The Tenth Amendment to the United States Constitution provides that "[t]he powers not delegated to the United States by the Constitution, nor prohibited by it to the States, are reserved to the States respectively, or to the people." U.S. Const. amend. X. The Tenth Amendment embodies the principle of federalism, or dual sovereignty for the states and the federal

government. *Printz v. United States*, 521 U.S. 898, 919 (1997). Thus, "Congress cannot compel the States to enact or enforce a federal regulatory program," nor can Congress "command the States' officers, or those of their political subdivisions, to administer or enforce a federal regulatory program." *Id.* at 935. The exact nature of (or basis for) Plaintiff's Tenth Amendment claim is not entirely clear. Regardless, the undersigned finds there is no commandeering by the federal government of state regulatory schemes, and therefore no violation of the Tenth Amendment. Plaintiff overlooks the fact that the Michigan Court of Appeals has expressly affirmed the MPSC's decision to approve DTE's opt-out program, and further found that the decision to use the AMI smart meters was a decision made by management at DTE, not by state or federal regulators or lawmakers. *In re Application of DTE*, Nos. 316728, 316781, 2015 WL 728383, at *4–5 (Mich. Ct. App. Feb. 19, 2015) ("DTE applied for approval of its AMI program, but that fact does not mandate a conclusion that DTE's decision regarding what meters to use is not a management decision.") The MPSC had previously approved DTE's request to increase rates to pay for the implementation of the AMI program in 2013. *See In re Application of DTE for Authority to Increase its Rates, and Amend its Rate Schedules and Rules for Governing the Distribution and Supply of Electric Energy*, No. U-15768, 2013 WL 5761071 (MPSC Oct. 17, 2013). Plaintiff does not allege any other specific ways that the AMI program amounts to commandeering by the federal government, and her claims under the Tenth Amendment should be dismissed as to all Defendants.

     5.    *Counts VII–XIV – alleged violations of state law*

Plaintiffs remaining claims all arise under state law: Count VI - "burdening utility easement;" Count VII - "diminution of property value;" Count VIII - "invasion of privacy;" Count IX - "conversion;" Count X - "personal injury;" Count XI - "gross negligence of Aric

14

Nesbitt & Frank Liberati;" Count XII - "trespass quare clausum fregit;" Count XIII - "trespass on the case;" and Count XIV - "trespass vi et armis." (*See* docket no. 1 at 55–62.) 28 U.S.C. § 1367(c)(3) provides that the court may decline to exercise supplemental jurisdiction over a claim if the court has dismissed all claims over which it has original jurisdiction. Because the undersigned has recommended dismissal of all of Plaintiff's federal claims, the undersigned further recommends that the court decline to exercise supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367(c)(3). *See Musson Theatrical, Inc. v. Fed. Express Corp.*, 89 F.3d 1244, 1254–55 (6th Cir. 1996) ("When all federal claims are dismissed before trial, the balance of considerations usually will point to dismissing the state law claims, or remanding them to state court if the action was removed.").

### 6. *John Doe defendants*

Finally, the undersigned notes that Plaintiff alleges claims against unnamed John Doe defendants. She describes the John Doe defendants as "unknown employees of DTE Energy Power Company" who allegedly trespassed on Plaintiff's property. (Docket no. 1 at 60.) The same reasons for dismissing each of Plaintiff's claims against Defendants McCormick and Sitkauskus apply to the John Doe defendants as well.

### D. Conclusion

For the above-stated reasons, it is recommended that each of the Defendants' motions to dismiss (docket nos. 11, 13, 17) be **GRANTED**. Moreover, all claims against the John Doe defendants should be dismissed for the same reasons the claims against Defendants McCormick and Sitkauskus should be dismissed, as set forth herein. This matter should therefore be dismissed in its entirety.

### III. NOTICE TO PARTIES REGARDING OBJECTIONS

The parties to this action may object to and seek review of this Report and Recommendation, but are required to act within fourteen (14) days of service of a copy hereof as provided for in 28 U.S.C. § 636(b)(1) and Eastern District of Michigan Local Rule 72.1(d). Failure to file specific objections constitutes a waiver of any further right of appeal. *Thomas v. Arn*, 474 U.S. 140, 149 (1985); *Howard v. Sec'y of Health & Human Servs.,* 932 F.2d 505 (6th Cir. 1991); *U.S. v. Walters*, 638 F.2d 947, 949-50 (6th Cir. 1981). Filing of objections which raise some issues but fail to raise others with specificity, will not preserve all the objections a party might have to this Report and Recommendation. *Willis v. Sec'y of Health & Human Servs.*, 931 F.2d 390, 401 (6th Cir. 1991); *Smith v. Detroit Fed'n Of Teachers Local 231*, 829 F.2d 1370, 1373 (6th Cir. 1987). Pursuant to E.D. Mich. LR 72.1(d)(2), a copy of any objections is to be served upon this Magistrate Judge.

Any objections must be labeled as "Objection #1," "Objection #2," etc. Any objection must recite *precisely* the provision of this Report and Recommendation to which it pertains. Not later than fourteen days after service of an objection, the opposing party must file a concise response proportionate to the objections in length and complexity. The response must specifically address each issue raised in the objections, in the same order and labeled as "Response to Objection #1," "Response to Objection #2," etc.

Dated: May 22, 2017         s/ Mona K. Majzoub
                            MONA K. MAJZOUB
                            UNITED STATES MAGISTRATE JUDGE

## **PROOF OF SERVICE**

      I hereby certify that a copy of this Report and Recommendation was served upon Plaintiff and counsel of record on this date.

Dated:  May 22, 2017        s/ Lisa C. Bartlett
                                      Case Manager